IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| WANDA BAPTIST GLASS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:12cv672 (REP) |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff is 42 years old, earned a Bachelor of Science degree and previously worked as a

manager of an Alcohol Beverage Control store.  On March 24, 2010, Plaintiff applied for

Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the

Social Security Act (the "Act") with an alleged onset date of September 10, 2004, alleging

disability due to degenerative disc disease, cervicalgia and obesity.  Plaintiff's claim was

presented to an administrative law judge ("ALJ"), who denied Plaintiff's request for benefits.

The Appeals Council subsequently denied Plaintiff's request for review.

Plaintiff now challenges the ALJ's denial of benefits, arguing that the ALJ improperly

assigned less than controlling weight to the opinions of her treating physicians.  This matter is

before the Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-

motions for summary judgment.[1]  Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g)

---

[1]       The administrative record in this case has been filed under seal, pursuant to E.D.
Va. Loc. R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any
personal identifiers such as Plaintiff's social security number, the names of any minor children,
dates of birth (except for year of birth), and any financial account numbers from its consideration

of the final decision of Defendant Commissioner denying Plaintiff's applications for Social Security Disability ("DIB") and Supplemental Security Income payments ("SSI"). The Commissioner's final decision is based on a finding by the ALJ that Plaintiff was not disabled as defined by the Social Security Act ("the Act") and applicable regulations.

For the reasons discussed herein, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13) and Motion to Remand (ECF No. 14) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 18) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

### A. Education and Work History

Plaintiff is 42 years old and earned a Bachelor of Science degree. (R. at 62.) Plaintiff worked as a manager of an Alcohol Beverage Control (ABC) store. (R. at 334.) Her other past work experience included working as a retail clerk at an ABC store, a custodian, a daycare director and a shift manager. (R. at 269.)

### B. Medical Records

#### 1. Dr. Carr

On July 13, 2004, Plaintiff was involved in a motor vehicle accident in which she was rear-ended at a stoplight. (R. at 444.) Plaintiff sought treatment at Bon Secours Memorial Regional Hospital for lower back pain. (R. at 444.) On July 22, 2004, Plaintiff received treatment from Dr. Jennifer Carr for neck and back pain. (R. at 493.) Plaintiff was three months pregnant. (R. at 493.) During Plaintiff's July 29, 2004 appointment with Dr. Carr, Plaintiff's back did not feel any better. (R. at 491.) She appeared alert and oriented. (R. at 491.) Plaintiff

---

of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

underwent a physical therapy evaluation on August 3, 2004, in which Plaintiff complained of stiffness in her neck that was increased by prolonged standing and sitting, and noted that she had difficulty achieving a comfortable position. (R. at 489.) She suffered limitations in sitting, reaching, working, standing, lifting, cooking and cleaning, but the therapist found no limitations in Plaintiff's ability to dress, bathe, sleep, perform yard work, walk, sleep or drive short distances. (R. at 489.)

During Plaintiff's August 23, 2004 appointment, Plaintiff was cleared to return to work. (R. at 487.) On August 24, 2004, Plaintiff was discharged from physical therapy with her goals partially met. (R. at 486.) On September 8, 2004, Dr. Carr indicated that Plaintiff suffered lower back pain and noted that Plaintiff could occasionally lift up to ten pounds. (R. at 483-84.) Further, Plaintiff could occasionally bend, kneel, climb stairs, reach above her shoulder and push/pull ten pounds. (R. at 484.) Plaintiff could never crawl, but had no limitations in her hand use. (R. at 484.) During an eight-hour work day, Plaintiff could perform four hours of sedentary activity. (R. at 485.) Plaintiff returned to work for one week, but indicated that she could not perform her job. (R. at 480.)

On December 9, 2004, Plaintiff complained of joint pain and stiffness, and Dr. Carr noted tenderness in Plaintiff's lumbar sacral area. (R. at 478.) Plaintiff delivered her baby on January 5, 2005. (R. at 477.) During her January 26, 2005 appointment with Dr. Carr, Plaintiff continued to suffer from lower back pain and indicated that it felt "as if her back is not aligned correctly." (R. at 477.) Plaintiff was referred to a chiropractor. (R. at 477.) Plaintiff followed up with Dr. Carr on February 24, 2005, and complained of more muscle aches in her lower back. (R. at 474.) On March 24, 2005, Plaintiff's back was not better and Plaintiff could not stand for more than fifteen minutes, bend, lie or sit for long periods of time. (R. at 472.)

Plaintiff underwent an MRI on April 12, 2005, because of her left lower leg pain. (R. at 471.) On April 21, 2004, Plaintiff followed up with Dr. Carr to review her MRI results, which were unremarkable. (R. at 470.) A neurologist saw Plaintiff to discuss her MRI results and "felt she needed more time to heal," but "would not recommend anything else at this time." (R. at 466.) Plaintiff followed up with Dr. Carr on May 16, 2005. (R. at 466.) During Plaintiff's June 22, 2005 appointment, Plaintiff noted that it was painful to twist form side to side or lift anything more than ten pounds. (R. at 464.) On July 20, 2005, Plaintiff complained of muscle weakness that stemmed from too much activity. (R. at 463.)

During Plaintiff's August 21, 2005 appointment, Plaintiff noted experiencing back pressure while driving. (R. at 458.) Plaintiff appeared worse during her September 28, 2009 appointment and wore a brace. (R. at 456.) She suffered decreased range of motion and pain when moving. (R. at 456.) On October 26, 2005, Dr. Carr noted no change in Plaintiff's condition and that it was painful for Plaintiff to stand, sit or lay for more than a few minutes. (R. at 454.) Plaintiff continued wearing a neck brace and constantly needed change to positions. (R. at 454.) However, Dr. Carr noted that Plaintiff had no pain when moving and demonstrated full range of motion. (R. at 454.) Dr. Carr indicated no change in Plaintiff's condition during her November 23, 2005 appointment. (R. at 451.) During Plaintiff's January 4, 2006 appointment, Plaintiff reported burning pain in her back. (R. at 601.) Plaintiff's movements were painful and she experienced decreased range of motion during her March 6, 2006 appointment. (R. at 598.) On April 3, 2006, Plaintiff could pick up her twenty pound daughter, but noted that it was painful to bend and twist. (R. at 596.) By May 1, 2006, Plaintiff was released by her pain specialist, but she experienced radiating pain down her right leg to her knee. (R. at 594.)

On April 1, 2009, Plaintiff was involved in another motor vehicle accident when a car ran a red light and struck the side of her vehicle. (R. at 642.) Dr. Carr treated Plaintiff for worsening back pain and complaints of depression and insomnia. (R. at 644.) Dr. Carr noted that the onset of Plaintiff's depression was gradual, yet consistent, and Plaintiff associated it with her change in job, past depression, difficulty sleeping and spontaneous crying. (R. at 644.) Plaintiff was treated with Ambien, Vicoden, Percocet and Cymbalta. (R. at 644.) On April 6, 2009, Dr. Carr treated Plaintiff for worsening back pain as a result of the accident. (R. at 642.) Plaintiff had some tenderness and spasms, however, her gait and posture remained normal. (R. at 642.)

On April 20, 2009, Dr. Carr treated Plaintiff for complaints of back pain and prescribed Amrix. (R. at 641.) On May 11, 2009, Dr. Carr examined Plaintiff and noted localized swelling and spasms in surrounding tissue and pain while moving. (R. at 639.) On July 6, 2009, Plaintiff continued to complain of back pain. (R. at 634.) Dr. Carr noted that although Plaintiff's pain did not radiate, symptoms were aggravated by exertion, prolonged standing, prolonged sitting, lying down, coughing and sneezing with no relieving factors. (R. at 634.) Dr. Carr's examination revealed localized swelling with spasms in the surrounding tissue and moderate tenderness. (R. at 635.)

On October 13, 2009, Plaintiff complained of lower back pain. (R. at 633.) The pain was located in the lumbosacral area and did not radiate. (R. at 633.) Though Plaintiff returned to work, she was not able to perform the work due to the pain. (R. at 633.) Plaintiff's symptoms were aggravated by exertion, prolonged standing, prolonged sitting, lying down, coughing and sneezing. (R. at 633.)

On December 14, 2009, Dr. Carr wrote a letter regarding Plaintiff's ability to work. (R. at 741.) Dr. Carr explained that Plaintiff had been her patient for several years and that Dr. Carr

5

treated Plaintiff for back pain, Plaintiff took morphine and she could not sit or stand for more than 5 to 10 minutes. (R. at 741.) Dr. Carr opined that employment would be difficult at the time. (R. at 741.)

### 2. Dr. Suratwala

On August 18, 2009, Dr. Sanjeev Suratwala of Tuckahoe Orthopaedic Associates, LTD, treated Plaintiff for complaints of back pain and diagnosed Plaintiff with degenerative disc disease and lower back pain. (R. at 665.) Dr. Suratwala ordered another MRI for Plaintiff. (R. at 665.) Dr. Suratwall opined that Plaintiff's condition was not amenable to surgical reconstruction. (R. at 665.) On August 31, 2009, Plaintiff's MRI revealed a mild diffuse disc bulging with facet hypertrophy at L4-5, small-based central disc protrusion and a small dorsal annular tear at L5-S1. (R. at 661-62.). Dr. Suratwala also noted that "[Plaintiff] has been comfortable for quite some time now and surgery would be a treatment of last resort." (R. at 662.)

Plaintiff underwent a CT scan on September 3, 2009, which indicated that Plaintiff had a degenerative L5-S1 disc with a posterior annular tear. (R. at 661.) Dr. Suratwala ultimately opined that surgery was not a good option, recommended continued non-surgical treatment and advised a weight-loss program. (R. at 661.)

### 3. Back Pain Network

Plaintiff underwent treatment at the Back Pain Network by Dr. Jawad Bhatti, complaining of lower back pain and leg pain on June 17, 2009 and July 1, 2009. (R. at 615, 619.) Plaintiff was diagnosed with myofacial pain, lower back pain, anxiety and vitamin D deficiency. (R. at 615, 619.) Plaintiff described her pain as constant, that her pain registered as a nine on a scale of one to ten and indicated that moving worsened her pain. (R. at 617.) On July

6

15, 2009, Plaintiff experienced abnormal range of motion, but her posture and gait were normal. (R. at 698.)

During Plaintiff's August 12, 2009 appointment, Plaintiff complained of lower back pain. (R. at 697.) On December 8, 2009, Plaintiff suffered pain, but indicated that her pain medications made her drowsy. (R. at 696.) Plaintiff reported that her activities of daily living improved. (R. at 696.) Her gait and posture appeared normal. (R. at 696.) Plaintiff sought treatment for her lower back pain and anxiety on January 5, 2010. (R. at 695.) During her follow-up appointment on February 16, 2010, Plaintiff complained of lower back pain, but her activities of daily living and anxiety appeared better. (R. at 694.) Plaintiff's pain worsened by her March 16, 2010 appointment. (R. at 693.) On April 13, 2010, Plaintiff indicated that her pain medication "helped" and that her activities of daily living and anxiety had improved. (R. at 692.) Plaintiff's activities of daily living were better on April 27, 2010. (R. at 691.) On May 11, 2010, Plaintiff complained of lower back pain, but Dr. Bhatti noted improvement in Plaintiff's activities of daily living. (R. at 690.) Plaintiff's pain registered as a four on a one to ten scale. (R. at 690).

On July 13, 2010, Dr. Bhatti completed a "Musculoskeletal Questionnaire" regarding Plaintiff's impairments. (R. at 731-36.) Dr. Bhatti wrote that he had treated Plaintiff since June 17, 2009. (R. at 731.) Plaintiff's pain caused significant range of motion limitations, sensory loss, impaired sleep, tenderness, swelling and muscle spasms. (R. at 732.) He estimated Plaintiff's pain as a six on a one to ten scale. (R. at 732.) Plaintiff experienced sedation and poor cognition as side effects from her medication and her pain frequently interfered with Plaintiff's concentration. (R. at 733.)

7

Dr. Bhatti opined that Plaintiff could sit or stand for no more than ten minutes continuously, could sit and stand/walk for less than two hours during an eight-hour work day and that Plaintiff needed to include periods of walking for five minutes in five minute intervals. (R. at 733-34.)  Plaintiff required a cane or other assistive device while walking or standing. (R. at 735.)  He further noted that Plaintiff needed to lie down at unpredictable intervals about every five to ten minutes. (R. at 734.)  Dr. Bhatti determined that Plaintiff could occasionally lift less than ten pounds and suffered significant limitations in reaching, handling and fingering. (R. at 735.)  Plaintiff could not bend and twist at the waist. (R. at 736.)

On August 24, 2010, Plaintiff's pain worsened and measured as a six on a one to ten scale. (R .at 739.)  During Plaintiff's September 21, 2010 appointment, Plaintiff indicated that her pain medication helped and Dr. Bhatti noted that Plaintiff's activities of daily living were better. (R. at 738.)  On October 19, 2010, Plaintiff returned to Dr. Bhatti to receive refills for her prescriptions. (R. at 737.)  Plaintiff visited Dr. Bhatti on February 2, 2011, and described constant, sharp, shooting and burning lower back pain. (R. at 729.)  Her medications were not helping. (R. at 729.)  During Plaintiff's February 9, 2011 appointment, Plaintiff complained of lower back pain, but indicated that physical therapy and a TENS unit helped. (R. at 727.)

On February 28, 2011, Dr. Bhatti noted that Plaintiff's pain decreased and her condition improved. (R. at 724.)  Plaintiff's activities of daily living increased and she slept better. (R. at 724.)  Plaintiff demonstrated continued improvement during her March 28, 2011, June 9, 2011 and July 7, 2011 appointments, including increased activities of daily living. (R. at 722.)  On August 9, 2011, Dr. Bhatti recommended electrical nerve therapy, physical therapy, occupation therapy and psychological therapy to treat Plaintiff's pain. (R. at 717.)

8

D. Non-treating Physicians

On February 8, 2006, David Williams, M.D., reviewed Plaintiff's medical records and indicated that Plaintiff could lift twenty pounds occasionally, ten pounds frequently and stand/walk and sit for about six hours during an eight-hour work day. (R. at 575.) Plaintiff had no limitations in her ability to push or pull and suffered no postural limitations or manipulative limitations. (R. at 575-76.)

On May 25, 2010, James Darden, M.D., medical consultant, reviewed Plaintiff's medical records. (R. at 121-30.) Dr. Darden diagnosed Plaintiff with spine disorders and disorders of muscle, ligament and fascia. (R. at 124.) Dr. Darden opined that Plaintiff could perform light work, occasionally lift twenty pounds, frequently lift ten pounds, and sit and stand/walk for about six hours during an eight-hour work day. (R. at 124, 126.) Further, Plaintiff occasionally required normal work breaks to alternate between sitting and standing. (R. at 126.) Plaintiff experienced no limitations in her ability to (1) climb ramps and stairs, (2) balance, (3) handle, (4) finger and (5) feel. (R. at 126-27.) Plaintiff experienced no visual, communicative and environmental limitations. (R. at 127.) Dr. Darden opined that Plaintiff could occasionally (1) climb ladders, ropes and scaffolds, (2) stoop, (3) kneel, (4) crouch and (5) crawl. (R. at 126.) Plaintiff was limited in her ability to reach left and right overhead. (R. at 127.)

On September 1, 2010, James Wickman, M.D., medical consultant, reviewed Plaintiff's medical records. (R. at 133-43.) Dr. Wickman's opinion was consistent with Dr. Darden's opinion. (R. at 139.)

E. Function Report Questionnaire

Plaintiff's completed a function report dated May 14, 2010. (R. at 368-375.) Plaintiff spent her days getting up, washing herself, eating breakfast, taking medicine, watching

television, listening to music, sleeping after taking medicine, eating dinner and going to bed.  (R. at 368.)  She took care of her five-year-old daughter by preparing breakfast and lunch and instructing her daughter to put clothes on with the assistance of her husband, son and mother. (R. at 369.)

Plaintiff noted that she no could longer cook alone, perform housework, shop and play with her children after the onset of her condition.  (R. at 369.)  Plaintiff could not sleep through the night and explained that the pain caused her to sleep for only three hours before waking up around 1:30 a.m. each night.  (R. at 369.)  Plaintiff experienced difficulty dressing, bathing her lower body and back, and grooming her own hair, and she needed help some days getting off of the toilet and sometimes had to use a cane to walk.  (R. at 369.)  During the day, Plaintiff prepared her own meals, but her husband and son prepared dinner.  (R. at 370.)  Plaintiff cooked twice a week by herself and it took her a couple of hours.  (R. at 370.)  She used to make full meals for her family, but could no longer do so.  (R. at 370.)  Plaintiff could not perform household chores or yardwork.  (R. at 370.)

Plaintiff wrote that she went outside two to three times a week to see the doctor.  (R. at 371.)  She drove or rode with someone else to these appointments.  (R. at 371.)  She also shopped in stores and by computer for groceries and clothes.  (R. at 371.)  Plaintiff shopped twice a week for about forty-five minutes to an hour and would go with a family member.  (R. at 371.)  She could pay bills, count change, handle a savings account and use a checkbook/money orders.  (R. at 371.)

Plaintiff listed her hobbies as watching television and listening to music and noted that she did them daily.  (R. at 372.)  Plaintiff did not spend time with others and only traveled to the doctor's office or other medical specialists on a regular basis.  (R. at 372.)  She went to doctors'

appointments about twice a month and needed reminders to attend her appointments. (R. at 372.) Plaintiff had no difficulty getting along with others, but indicated that she was more outgoing before her condition. (R. at 373.)

Plaintiff's condition affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks and concentrate. (R. at 373.) She experienced no difficulty talking, hearing, seeing, understanding, following instructions, using hands or getting along with others. (R. at 373.) Plaintiff could walk about 50 yards before needing to rest for five to ten minutes. (R. at 373.) She could pay attention for ten to fifteen minutes. (R. at 373.) Plaintiff needed to "mark her place" when following written instructions and required repetition when following spoken instructions. (R. at 373.) She had no difficulty getting along with authority figures, but did not handle changes in her routine and stress well. (R. at 374.) Plaintiff noted that she suffered depression. (R .at 374.) She used a cane sometimes and a brace/splint daily since 2007. (R. at 374.)

F. Plaintiff's Testimony

Plaintiff testified before an ALJ on April 3, 2009, and indicated that she could lift around five pounds less than several times a day. (R. at 31.) She could carry about six pounds. (R. at 31.) Plaintiff could stand for about ten to fifteen minutes without her pain level increasing. (R. at 31.) She could relieve this pain by shifting side to side. (R. at 32.) Plaintiff could walk about 50 yards and experienced difficulty when climbing steps. (R. at 32.) She used a cane on occasions and that helped. (R. at 33.) Plaintiff could sit for about ten to fifteen minutes and could not sleep through the night because of her pain. (R. at 33.) Plaintiff took Vicoden, Percocet and Ambien, and noted that they reduced her pain. (R. at 33-34.) She could not reach above her head, bend over or reach the floor. (R. at 34.)

Each day Plaintiff woke up, made breakfast and took her daughter to day care.  (R. at 36.) Plaintiff's daughter dressed herself and her husband bathed her.  (R. at 36.)  Plaintiff went to church, but could not sit through the entire forty-five minute service.  (R. at 37.)  Her husband and son help with housework and shopping.  (R. at 37-38.)  Plaintiff drove her daughter to day care for two years and it took about twenty to thirty minutes.  (R. at 46.)  When Plaintiff returned home, she would take her medicine and try to get comfortable.  (R. at 46.)

On September 1, 2011, Plaintiff testified before an ALJ.  (R. at 55.)  Plaintiff said that she was married with two children— seventeen and six years old, respectively.  (R. at 63.)  Plaintiff earned a Bachelor of Science degree and received training to be an ABC store manager.  (R. at 64.)  She stopped working in March of 2009, because the Morphine and Baclofen that she took caused her to be not fully awake, dizzy and sometimes nauseous, she was in constant pain and not able to sit or stand for long periods of time.  (R. at 65, 70.)

If Plaintiff did not feel the side effects of her medication, she would do things around the house for herself and the children.  (R. at 71.)  However, when she did feel the side effects, she had to lie down.  (R. at 71.)  She laid down the majority of the day and could not make it through one day without lying down.  (R. at 72.)  Other methods that she used to deal with pain included heat, a TENS unit and a brace.  (R. at 72-73.)  Activities that would aggravate Plaintiff's pain included bending, stooping and reaching.  (R. at 73.)  She could sit comfortably for five to six minutes, stand for five to six minutes, walk 50 yards and could lift five pounds.  (R. at 73-74.)

Plaintiff showered daily, got dressed every day and could cook and clean the kitchen with assistance from her family.  (R. at 74-75.)  During the week, Plaintiff drove two or three times to either the doctor or the store.  (R. at 76.)  During the average day, Plaintiff spent thirty minutes

12

reading and two to three hours watching television. (R. at 77.) She checked her email twice a week and spent a total of three to four hours a week total on the computer. (R. at 77.)

Plaintiff visited her parents, who lived two hours away, once a month and her son drove there. (R. at 78.) While visiting her parents, she attended church. (R. at 78.) Plaintiff went grocery shopping once a week, but did not travel anywhere else, including not going out to eat. (R. at 79.)

## II. PROCEDURAL HISTORY

Plaintiff protectively filed her current applications for DIB and SSI on March 24, 2010, alleging an onset date of September 10, 2004. (R. at 11.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[2] (R. at 11.) On September 1, 2011, Plaintiff appeared with counsel and testified at a hearing before an ALJ. (R. at 11.) The date of the disability's onset was amended to June 2, 2009, because of an unfavorable, earlier ALJ decision issued on June 1, 2009. (R. at 11.) On October 20, 2011, the ALJ denied Plaintiff's application, finding that she was not disabled under the Act. (R. at 19.) The Appeals Council subsequently denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1.)

## III. QUESTION PRESENTED

Did the ALJ error in affording less than controlling weight to Plaintiff's treating physician's opinion?

---

[2]     Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. Part 404, Subpart Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted). To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact — if the findings are supported by substantial evidence — are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477 (citation omitted). If the ALJ's determination is not supported by substantial evidence on the record or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). The analysis is conducted for the Commissioner by the ALJ and it is

14

that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work based on an assessment of the claimant's residual functioning capacity ("RFC") and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her

limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Hancock,* 667 F.3d at 472-73; *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at 146, n.5). The Commissioner can carry her burden in the final step with the testimony of a Vocational Expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).V.

## V. ANALYSIS

### A. The ALJ's Opinion

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the alleged onset of her disability. (R. at 14.) At step two, the ALJ found that Plaintiff had the severe impairments of degenerative disc disease, cervicalgia and obesity. (R. at 14.) The ALJ acknowledged that Plaintiff reported anxiety and depression; however, the ALJ found that Plaintiff failed to establish a medically determinable mental disorder because of no record of

diagnosis, treatment or limitations related to depression or anxiety existed. (R. at 14.) At step

three, the ALJ concluded that Plaintiff's impairments did not meet the criteria of an impairment

listed in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 14). Before considering step four, the ALJ

determined that Plaintiff had the RFC to perform light work, except that she could only

occasionally stoop, kneel, crouch, crawl and climb ropes, ladders or scaffolds. (R. at 15).

Plaintiff could not reach overhead and she needed to be able to alternate between sitting and

standing. (R. at 15.)

At step four, the ALJ determined that Plaintiff could not perform her past relevant work

as a retail clerk, store manager, shift manager and janitor, because the work required medium to

heavy exertion. (R. at 17.) At step five, after considering Plaintiff's age, education, work

experience and RFC, and after consulting a VE, the ALJ found that there were other occupations

which exist in significant numbers in the national economy that Plaintiff could perform. (R. at

17.) Specifically, the ALJ found that Plaintiff, regardless of her limitations, could work as an

office helper, router and non-postal worker. (R. at 18.) Accordingly, the ALJ concluded that

Plaintiff was not disabled. (R. at 18.)

Plaintiff moves for summary judgment or, in the alterative, for remand, arguing that the

ALJ failed to follow the treating physician rule. (Pl.'s Mem in Supp. of Mot. for Summ. J.

("Pl.'s Mem.") (ECF No. 15) at 19.) Defendant contends that substantial evidence supports the

ALJ's determination to afford less than controlling weight to Plaintiff's treating physician's

opinion. (Def.'s Mot. for Summ. J. and Mem. in Supp. ("Def.'s Mem.") (ECF No. 18) at 9.)

      B.  The ALJ did not err in affording less than controlling weight to the opinion of
          Plaintiff's treating physician.

Plaintiff contends that the ALJ erred by assigning Dr. Bhatti's, Plaintiff's treating

physician, opinion no weight. (Pl.'s Mem. at 19.) Specifically, Plaintiff argues that the ALJ

failed to consider all of the required factors in rendering the determination and failed to provide evidence to support her decision. (Pl.'s Mem. at 19-22.) Defendant maintains that the ALJ did in fact articulate "good reason" for affording no weight to Dr. Bahtti's opinion and that the ALJ's decision was supported by substantial evidence in the record. (Def. Mem. at 9-16.)

Here, the record indicates that the ALJ afforded no weight to Dr. Bhatti's opinion, because it was "inconsistent with the objective findings on examination, the nature of her medical care and the response to treatment, and [Plaintiff's] admitted daily activities." (R. at 17). The ALJ instead afforded weight to the state agency consultants' opinions, because the "[RFC] assessment is supported by the nature of her medical care and response to treatment, the objective findings on examinations, and [Plaintiff's] admitted daily activities, and it takes into consideration the opinions of other sources and [Plaintiff's] subjective complaints." (R. at 17).

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. *See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the Plaintiff's treating physician, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. *See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be

given controlling weight if it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.,* when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. 20 C.F.R. § 404.1527(d)(3)-(4), (e).

While the ALJ must generally give more weight to a treating physician's opinion, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig,* 76 F.3d at 590 (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). Since its decision in *Hunter*, the Fourth Circuit has consistently held that, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Mastro*, 270 F.3d at 178 (citing *Craig*, 76 F.3d at 590); *see also* 20 C.F.R. § 416.927(d)(2).

The factors set forth in C.F.R. § 404.1527(d)(2)-(6) require the ALJ to consider: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area which an opinion is rendered; and (6) other factors brought to the Commissioner's attention which tend to support or contradict the opinion.

In making her decision, the ALJ properly considered all the factors. Although Plaintiff argued that the ALJ failed to provide evidence to support his determination, the record indicates

that the ALJ did consider all of the evidence and provided his reasoning for not affording any weight to Dr. Bhatti's opinion. In her decision, the ALJ laid out the evidence from the record regarding pertinent clinical findings and Plaintiff's admitted daily activities. (R. at 16.) Although the ALJ did not detail the inconsistencies point by point, the ALJ properly considered the evidence, considered all of the factors and found that Dr. Bhatti's opinion was inconsistent with the medical records and the record. (R. at 16-17.) As such, the ALJ properly provided support and reasoning behind her decision to afford Dr. Bhatti's opinion no weight.

Further, substantial evidence supports the ALJ's determination. Dr. Bhatti opined that Plaintiff could sit less than two hours a day, stand less than two hours and lift less than ten pounds. Dr. Bhatti further indicated that Plaintiff required an assistive device, had significant limitations reaching, handling, and fingering, could not bend and twist at the waist at all, her symptoms frequently interfered with attention and concentration, and sedation from medications caused poor cognition. (R. at 16).

Here, substantial evidence supports the ALJ's determination that Dr. Bhatti's opinion was inconsistent with his medical records. Specifically, during the appointment before Dr. Bhatti issued his opinion that Plaintiff experienced pain that registered as a six on a one to ten scale, Plaintiff's pain was measured at four on a one to ten scale. (R. at 690.) Further, Plaintiff's activities of daily living continued to improve. On December 8, 2009, Plaintiff reported that her activities of daily living improved. (R. at 696.) Her gait and posture appeared normal. (R. at 696.) During her follow-up appointment on February 16, 2010, Plaintiff's activities of daily living and anxiety appeared better. (R. at 694.) On April 13, 2010, Plaintiff indicated that her pain medication "helped," and her activities of daily living and anxiety had improved. (R. at 692.) Plaintiff's activities of daily living were better as of April 27, 2010. (R. at 691.) On May

11, 2010, Dr. Bhatti noted that her improvement in Plaintiff's activities of daily living. (R. at 690.) During Plaintiff's September 21, 2010 appointment, Plaintiff indicated that her pain medication helped and Dr. Bhatti noted that Plaintiff's activities of daily living were better. (R. at 738.) On February 28, 2011, Dr. Bhatti noted that Plaintiff's pain decreased and her condition improved. (R. at 724.) Plaintiff's activities of daily living increased and she slept better. (R. at 724.) Plaintiff demonstrated continued improvement during her March 28, 2011, June 9, 2011, and July 7, 2011 appointments, including improved activities of daily living. (R. at 722.)

Further, substantial evidence demonstrates that Dr. Bhatti's opinion was inconsistent with the record as a whole. Dr. Williams opined that Plaintiff could lift twenty pounds occasionally, ten pounds frequently and stand/walk and sit for about six hours during an eight-hour work day. (R. at 575.) Plaintiff had no limitations in her ability to push or pull and suffered no postural limitations or manipulative limitations. (R. at 575-76.) Drs. Darden and Wickman determined that Plaintiff could perform light work, occasionally lift twenty pounds, frequently lift ten pounds, and sit and stand or walk for about six hours during an eight-hour work day. (R. at 124, 126, 139.) Further, Plaintiff occasionally required normal work breaks to alternate between sitting and standing. (R. at 126, 139.) Plaintiff experienced no limitations in her ability to (1) climb ramps and stairs, (2) balance, (3) handle, (4) finger and (5) feel. (R. at 126-27, 139.) She further experienced no visual, communicative and environmental limitations. (R. at 127, 139.) Dr. Darden opined that Plaintiff could occasionally (1) climb ladders, ropes and scaffolds, (2) stoop, (3) kneel, (4) crouch and (5) crawl. (R. at 126, 139.) Plaintiff was limited in her ability to reach left and right overhead. (R. at 127, 139.)

Plaintiff herself indicated that she prepared her own meals. (R. at 370.) She could pay bills, count change, handle a savings account and use a checkbook/money orders. (R. at 371.)

21

Plaintiff could walk about 50 yards. (R. at 373.) Plaintiff testified that if she did not feel the side

effects of her medication, she would do things around the house for herself and her children. (R.

at 71.) During the average day, Plaintiff spent thirty minutes reading and two to three hours

watching television. (R. at 77.) She checked her email twice a week and spent a total of three to

four hours a week total on the computer. (R. at 77.) All of which supported the ALJ's

determination.

Because the ALJ properly considered the required evidence and her decision is supported

by substantial evidence in the record, the ALJ did not err in assigning Dr. Bhatti's opinion less

than controlling weight.

## VI. CONCLUSION

Based on the foregoing analysis, the Court recommends that Plaintiff's Motion for

Summary Judgment (ECF No. 13) and Motion to Remand (ECF No. 14) be DENIED; that

Defendant's motion for summary judgment (ECF No. 18) be GRANTED; and, that the final

decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable

Robert E. Payne and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and**

**recommendations of the Magistrate Judge contained in the foregoing report within**

**fourteen (14) days after being served with a copy of this report may result in the waiver of**

**any right to a de novo review of the determinations contained in the report and such failure**

**shall bar you from attacking on appeal the findings and conclusions accepted and adopted**

by the District Judge except upon grounds of plain error.

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  September 3, 2013

23